## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

JOHN T. HAWN,              )
                                )
          Plaintiff,      )
                                )
     vs.                  )  Case No. 2:16-CV-42
                                )
NANCY A. BERRYHILL,      )
Deputy Commissioner of Operations,  )
Social Security Administration,    )
                                )
         Defendant.     )

## MEMORANDUM AND ORDER

      Plaintiff John Hawn seeks review of the decision of Defendant Nancy Berryhill, Deputy

Commissioner of Operations, Social Security Administration (SSA), denying his application for

a period of disability, Disability Insurance Benefits, and Supplemental Security Income under the

Social Security Act.[1]  Because the Court finds that substantial evidence supports Defendant's

decision denying Social Security benefits to Plaintiff, the Court affirms the denial.

### I.    Background and Procedural History

     In June 2013, Plaintiff filed an application for a period of disability, Disability Insurance

Benefits, and Supplemental Security Income claiming that he was disabled as of October 31,

2012 due to allegations of depression, seizures, chronic obstructive pulmonary disease (COPD),

arthritis, restless leg syndrome, pain, asthma, and fatigue.  The SSA denied Plaintiff's claims,

and he filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 124).

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing on February 2,

2015. (Tr. 171).

---

[1] The parties consented to the exercise of authority by the United States Magistrate Judge
pursuant to 28 U.S.C. § 636 (c). (ECF No. 9).

In February 2015, the ALJ issued a decision finding that Plaintiff "has not been under a disability . . . from October 31, 2012, through the date of this decision[.]" (Tr. 33)  Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council and submitted additional medical evidence. (Tr. 1-6, 8)  The Appeals Council found that Plaintiff's more recent medical records did "not provide a basis for changing the Administrative Law Judge's decision," and it denied review. (Tr. 2)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as Defendant's final decision. <u>Sims v. Apfel</u>, 530 U.S. 103, 106-07 (2000).

## II.    Administrative Proceeding

### A. Testimony at the hearing

Plaintiff appeared with counsel at the hearing in February 2015. (Tr. 41) Plaintiff testified that he was forty-eight years old, lived with his ten-year-old daughter, and had a high school degree and a certification "in autobody from votech school." (Tr. 44, 46)   He worked as an industrial maintenance mechanic at Watlow Missouri, Inc. for fifteen years, until he was laid off in 2009. (Tr. 47)  Plaintiff acknowledged that he "had problems with alcohol in the past" but had been "clean and sober" for five months. (Tr. 46-47)

Plaintiff testified that a car struck him in a hit and run accident in 2008. (Tr. 47).  As a result of the accident, Plaintiff suffered a torn rotator cuff, broken wrist, and broke his "right leg at the knee." (<u>Id.</u>)  The accident also injured Plaintiff's lower back, which "hurts continuously." (Tr. 48)  Plaintiff's back pain "shoots down my legs . . . [a]ll the way past my knees." (Tr. 59)

Plaintiff stated that his right knee was "painful all the time" and described the pain as "stabbing." (Tr. 49)  As a result of his torn rotator cuff, which was not surgically repaired, Plaintiff was unable to raise his arm above his head or lift more than five or ten pounds. (Tr. 50-51)  Plaintiff explained that, if he attempted to carry a gallon of milk more than twenty-five feet,

his "hand go[es] numb" and he would "lose my grip." (Tr. 51) Plaintiff testified that he took methodone for the pain in his back, knee, and shoulder. (Tr. 48, 52)

Next, Plaintiff stated that he suffered a seizure disorder and experienced "six to eight" grand mal seizures per year. (Tr. 55) Finally, Plaintiff stated that he had been diagnosed with COPD and emphysema. (Tr. 56) He was able to walk "maybe 25 feet" before becoming short of breath, at which time Plaintiff would sit down, use his inhaler, and rest for fifteen minutes. (Id.)

Plaintiff had difficulty sleeping and typically woke up every hour. (Tr. 57-58) He attributed his poor sleep "more to the pain in my back that wakes me up, because I'm laying [sic] flat. And my legs will go numb. I've also got restless leg syndrome." (Tr. 58) Medication helped the restless leg syndrome "some." (Tr. 59) Plaintiff also took medication for depression and anxiety. (Tr. 64)

On a typical day, Plaintiff woke up around 6:00 a.m. to "get my daughter ready for school." (Tr. 57) Plaintiff was unable to twist or squat, could "stand 20, 30 minutes maybe," and could sit for fifteen to thirty minutes. (Tr. 60) He stated: "Most of the day I find myself sitting on the couch" and he usually "take[s] a couple naps during the day[.]" (Tr. 60, 63) Plaintiff was "not supposed to drive due to the seizures," so when he needed to shop, his neighbor or older daughter would drive him to the store and help lift groceries. (Tr. 61) Plaintiff did dishes and laundry and was able to shower and dress himself. (Tr. 62) He also fed and cared for his daughter's dog. (Tr. 62-63)

A vocational expert also testified at the hearing. (Tr. 65) The ALJ asked the vocational expert to consider a hypothetical individual with the same age, education, and past work as Plaintiff and the ability to perform light work limited to "simple, routine tasks" in an environment free of irritants or hazards, such as dangerous machinery. (Tr. 66) The vocational

expert testified that such individual could not perform Plaintiff's past work, but could perform the jobs of packager, assembler, or cleaner. (Tr. 67) When Plaintiff's attorney added to the hypothetical a limitation on the use of the individual's right arm, the vocational expert testified that an "individual in these unskilled positions would require bilateral use of their hands and arms at the frequent level." (Tr. 67)

### B. Relevant medical records

Plaintiff established care with Dr. Tucker, his primary care physician, in June 2011. (Tr. 454) At that time, Plaintiff's complaints included difficulty exhaling, right shoulder pain, and right knee pain. (Tr. 454) Dr. Tucker detailed Plaintiff's long history of smoking before noting Plaintiff had a barrel chest deformity and distant bilateral lung sounds, likely attributed to his COPD and emphysema. (Id.) Dr. Tucker advised Plaintiff to cease smoking "as soon as possible" and prescribed Dulera. (Id.).

In regard to his pain, Plaintiff informed Dr. Tucker that it was "much worse when he gets up in the morning and tends to limber up as the day goes on." (Id.). Plaintiff had negative tests for rotator tendonitis on the right and left sides. (Id.) Dr. Tucker observed that Plaintiff's knee had crepitus, or crackling, with range of motion and limited range of motion. (Id.) He prescribed meloxicam and scheduled a follow-up visit to reevaluate Plaintiff's knee and shoulder pain for improvement. (Id.).

Plaintiff followed up with Dr. Tucker a couple weeks later and reported that "he [had] done quite a bit better since he [had] been on [meloxicam]." (Tr. 456). Dr. Tucker noted that Plaintiff "is much better with his right shoulder including improved range of motion." (Id.). However, Plaintiff claimed he did not receive the same relief with his right knee and requested more medication. (Id.) Dr. Tucker refilled Plaintiff's hydrocodone and continued the meloxicam.

(Id.)  Dr. Tucker also noted that Plaintiff's "mood is depressed" and prescribed fluoxetine.  (Id.)
Plaintiff's COPD "had improved," and Dr. Tucker encouraged him to stop smoking.  (Id.)

That same month, Plaintiff saw Dr. Parikh for his COPD.  (Tr. 503)  Plaintiff's complaints
included "cough, wheezing, chest tightness and shortness of breath," all of which "have been
getting progressively worse[.]"  (Tr. 503)  Dr. Parikh ordered a CAT scan and pulmonary
function test and prescribed prednisone and ciprofloxacin.  (Tr. 505)  The pulmonary function
test showed "normal flows, normal lung volumes, normal diffusion capacity, but his "mid
expiratory flows [were] reduced."  Dr. Parikh diagnosed Plaintiff with severe persistent asthma,
severe allergic rhinitis, and eosinophilia.  (Tr. 507)

In August 2011, Plaintiff returned to Dr. Tucker with back pain after working in the heat
and "[doing] some wood cutting [to get] ready for winter."  (Tr. 458)  He requested a "larger
size" of his medication, and Dr. Tucker increased his hydrocodone count from 60 to 90.  (Id.)
Plaintiff's "mood is improved, but not where he feels it is stable," his lung sounds were clear,
and he had negative straight leg lifting tests on both sides. (Id.).

At his next appointment with Dr. Tucker in October 2011, Plaintiff reported that his back
pain "is much worse recently" and was "getting to the point where it is unbearable."  (Tr. 459)
Plaintiff also complained of coughing and chest congestion.  (Id.)  Plaintiff had negative straight
leg lifting tests, but his right shoulder and right knee had pain with range of motion.  (Id.)  X-rays
revealed an "[e]ssentially unremarkable lumbar spine."  (Tr. 669)  Dr. Tucker ordered an MRI
and advised Plaintiff that quitting smoking could "improve his pain by 60%."  (Tr. 458)

Plaintiff returned to Dr. Tucker's office the following month requesting refills of his pain
medications.  (Tr. 462)  Dr. Tucker refilled Plaintiff's hydrocodone and planned to schedule an
MRI "to rule out the cause of his chronic low back pain and consider surgical referral or pain

management referral . . . as his pain medications are no longer working in an adequate fashion."[2] (Id.)  Dr. Tucker also refilled Plaintiff's Combivent HFA and instructed Plaintiff to continue using the Dulera inhaler because Plaintiff was "having fairly good success with that device." (Id.)

In December 2011, Plaintiff informed Dr. Tucker that he had recently visited his mother and "unfortunately left his medications for pain in Kansas when he came back."  (Tr. 463) Plaintiff was "walking hunched over" and explained that "he has been doing a lot of fence row working on his farm and . . . the medications are not working well anyway."  (Id.)

Plaintiff followed up with Dr. Tucker the following month and reported that "his medications are working well and controlling the pain well." (Tr. 464)  However, he also stated that "his shoulder pain is increasing with activity and his low back pain is worsening."  (Id.)  Dr. Tucker noted Plaintiff's straight leg lifting tests were negative, but his right shoulder had a "frozen . . . appearance when he raised his arm upward" and "palpable crepitus." (Tr. 464).  Dr. Tucker discontinued Plaintiff's meloxicam prescription and replaced it with ibuprofen.  (Id.)  In March 2012, Plaintiff claimed his "shoulder pain [was] worse when he lift[ed] his arms above his shoulder," but denied numbness, tingling, or difficulties gripping.  (Tr. 467).  Dr. Tucker refilled Plaintiff's hydrocodone, increased his fluoxetine, and advised him to stop smoking.  (Id.)

Plaintiff also visited Dr. Parikh that month, and Dr. Parikh noted that Plaintiff was "doing quite well in terms of breathing" and "shortness of breath [was] definitely improved," although he continued to have shortness of breath and wheezing.  (Tr. 510)  Plaintiff continued to complain about shortness of breath in April and May 2012.  (Tr. 512, 515)

---

[2] According to Dr. Tucker's treatment notes of January 2012, Plaintiff's insurance company denied coverage for an MRI because "they wanted us to have a longer period of conservative treatment documented before the MRI would be allowed."  (Tr. 467)

When Plaintiff returned to Dr. Tucker's office in March 2012, his right shoulder pain was worse and he reported smoking one and a half packs of cigarettes per day. (Tr. 467) The next month, Dr. Tucker received a phone call from the emergency room informing him that Plaintiff had presented with "withdrawal" because "he had been using more of his pain medications than were allowed by his schedule and ran out of them several days ago[.]" (Tr. 470) Plaintiff followed up with Dr. Tucker a couple days later and admitted that "he has been using heroin at least daily for 12 months or more" and "he was not using [the hydrocodone] correctly either." (Tr. 471) Dr. Tucker referred Plaintiff for Suboxone induction treatment. (Id.)

Later that month, Dr. Tucker administered "osteopathic manipulative treatment using high velocity, low amplitude maneuvers to the cervical, thoracic and lumbar spine with good results noted by patient after manipulation." (Tr. 473) Plaintiff also underwent a CT of his chest, which revealed pulmonary emphysema and stable pulmonary nodules, interval worsening of patchy bilateral diffuse ground glass infiltrate, and "most likely ingested" hyperdense material within the mid esophagus and stomach. (Tr. 492)

When Plaintiff returned to Dr. Tucker's office in May 2012, he was receiving Suboxone treatment from Dr. Spalding and reported "doing well with that and it helps pain, but it is not helping some of the pain he has." (Tr. 474) Dr. Tucker observed that Plaintiff "was very anxious" and was "obviously having some withdrawal during our evaluation." (Tr. 474) Plaintiff's spine was tender and had "restricted motion over the right lumbar, right thoracic and left cervical spine by palpation." (Id.) Dr. Tucker repeated the osteopathic manipulative treatment and recommended back and leg exercises. (Id.)

The next month, Plaintiff's low back was tender and his straight leg lifting test returned negative results. (Tr. 454) Plaintiff saw Dr. Akhataruzzaman for difficulty breathing. (Tr. 532)

Plaintiff reported cough, shortness of breath, and wheezing, but denied joint and muscle pain. (Tr. 532-33)  Cipro reduced his cough and wheezing.  (Tr. 539)

In July 2012, Plaintiff was taking a combination of gabapentin, piroxicam, and Suboxone, but his pain was "not well controlled."  (Tr. 548)  Plaintiff also complained of "a lot of cramping in his legs . . . always in the evening, usually when he starts to slow down and quits working…." (Id.)  Dr. Tucker prescribed ropinirole for restless leg syndrome.  (Tr. 549)

Plaintiff presented to the emergency room in October 2012 "after having started drinking alcohol again."  (Tr. 569, 595)  Plaintiff reported two seizures, chest pain, back pain, and vomiting.  (Tr. 569, 573)  Imaging of his chest revealed peripancreatic inflammatory change, moderate changed emphysema, indeterminate nodular densities in his right lung, and "no acute process in the chest."  (Tr. 581, 602)  Plaintiff had good range of motion in his extremities.  (Tr. 593)  Dr. Tucker diagnosed Plaintiff with pancreatitis, seizure secondary to withdrawal from alcohol and gabapentin, narcotic dependence, chronic alcoholism, electrolyte abnormalities, nicotine dependence, COPD, and restless leg syndrome, and advised him to "restore his activity as rapidly as possible."  (Tr. 587, 589)   MRI scans of Plaintif's brain with and without contrast were negative.  (Tr. 601, 605)

Plaintiff followed up with Dr. Tucker in November 2012.  (Tr. 690)  Plaintiff reported feeling "terribly nervous" since his hospitalization and requested a prescription of Viagra.  (Tr. 690)  He was "tremulous in his hands" and his "lung sounds had some wheezes bilaterally and distant breath sounds."  (Tr. 691)

Plaintiff returned to the emergency room in December 2012 with nausea, vomiting, chills, and "generalized aches and pains all over."  (Tr. 608, 612)  He reported "being in a crawl space all last week remodeling."  (Tr. 608)

In February 2013, Plaintiff presented to Dr. Parikh with cough, wheezing, chest tightness, and shortness of breath. (Tr. 707) Plaintiff was hypoxemic, but he refused to be admitted to the hospital. (Id.) Plaintiff followed up with Dr. Parikh ten days later, and Dr. Parikh noted that Plaintiff "has definitely started to make some improvement" with oral prednisone. (Tr. 698) Plaintiff reported no muscle aches, joint pain or joint stiffness and musculoskeletal system was "normal." (Tr. 700-01) Dr. Parikh recommended Plaintiff quit smoking and continued his medications. (Tr. 698)

At a recheck in Dr. Tucker's office in June 2013, Plaintiff complained that he was "tired all the time" and "coughs frequently," but his musculoskeletal exam was normal. (Tr. 712, 714) Plaintiff continued to smoke daily. (Tr. 714) A sleep study revealed that Plaintiff had sleep apnea, and doctors at the sleep disorder clinic prescribed a CPAP and recommended that Plaintiff avoid smoking and "drinking alcohol before sleep." (Tr. 1036-37)

In August 2013, Plaintiff presented to the emergency room with abdominal pain. (Tr. 729) An ultrasound of his right upper quadrant of the abdomen suggested that "heavy drinking binge that he had sustained several days before the development of his pain had led to a recurrent bout of acute pancreatitis."[3] (Id.) Dr. Spalding restarted Plaintiff's Suboxone treatment. (Tr. 730) Dr. Tucker noted Plaintiff's mid and chronic lower back pain and tenderness over the lumbar musculature and the lower thoracic musculature. (Tr. 733) Plaintiff had "some wheezes in the right lung field" but "no breathing distress and no retractions." (Id.) Lifting test of both legs were negative. (Tr. 734)

---

[3] Plaintiff informed Dr. Tucker that "he was fixing a flat tire at a neighbor's house and this neighbor brought out some beer, which he started drinking with the neighbor. He then became intoxicated and he basically fell off the wagon." (Tr. 731)

Dr. Tucker evaluated Plaintiff and completed a medical source statement (MSS) in September 2013. (Tr. 758-61, 1040) Dr. Tucker also wrote a letter to Plaintiff's attorney, which detailed his findings and revealed that he completed the MSS checklist based upon Plaintiff's self-reported limitations. (Tr. 1042-45)

In the MSS, Dr. Tucker opined that, due to Plaintiff's back and knee pain, he could: occasionally lift/carry twenty pounds; frequently lift/carry ten pounds; stand/walk two hours in an eight-hour workday; sit less than two hours in an eight-hour workday; occasionally twist, stoop, crouch, climb stairs, reach, feel, push, and pull; and frequently handle and finger. (Tr. 758-59) Additionally, Plaintiff could sit fifteen minutes, stand five minutes, and walk ten minutes at a time and required the option to shift from sitting to standing/walking at will. (Tr. 758) Dr. Tucker also found that Plaintiff would need to lie flat for twenty minutes at unpredictable intervals and take unscheduled breaks during the day. (Tr. 758-59, 761)

Plaintiff followed up with Dr. Tucker in January 2014. (Tr. 1046) Plaintiff's primary complaint was "terrible abdominal pain," which Dr. Tucker opined was consistent with Crohn's disease and chronic pancreatitis. (Tr. 1048) Plaintiff reported that he had been sober from alcohol for four months. (Id.) Dr. Tucker's treatment notes do not mention back, knee, or shoulder pain. (Tr. 1046-49) At a follow-up appointment one month later, Plaintiff complained of abdominal pain and constipation. (Tr. 1050) A review of his musculoskeletal system was normal. (Tr. 1051)

In March 2014, Plaintiff presented to the emergency room with chest pain, abdominal pain, nausea, and vomiting. (Tr. 793, 824) A gastroenterologist concluded that Plaintiff's symptoms and sudden onset were "very suggestive of infectious colitis" and ruled out Crohn's disease. (Tr. 793) At a follow-up appointment Dr. Tucker, Plaintiff complained of "a lot more low back

pain," and Dr. Tucker noted he had a "restricted range of motion of the right and left cervical spine by palpation, almost spastic." (Tr. 1054-55) Dr. Tucker administered osteopathic manipulative treatment using high-velocity, low-amplitude maneuvers "with good results noted by patient after manipulation." (Tr. 1055)

Plaintiff returned to the hospital twice in April 2014 with abdominal pain, nausea, vomiting, and diarrhea. (Tr. 768, 900) Plaintiff reported smoking one pack of cigarettes per day and "drink[ing] alcohol almost daily." (Tr. 900) His musculoskeletal examination showed "no back pain, no joint swelling, [and] no limb pain[.]" (Tr. 769) Plaintiff requested Dilaudid, but the doctor denied the request and instead prescribed anti-nausea medications and acetaminophen-hydrocodone. (Tr. 773, 775) Plaintiff followed up with Dr. Tucker about his chronic back pain, and Dr. Tucker noted that Plaintiff's "low back area was tender over the lumbar spine musculature. There was no spinous process tenderness, no sacroiliac tenderness, and lifting tests on both legs were negative." (Tr. 1061)

Plaintiff returned to the hospital in June 2014 with abdominal pain, and received a diagnosis of acute colitis. (Tr. 860) Dr. Parikh ordered antibiotics, electrolytes, and IV hydration and noted, "The patient has been drinking quite heavily. Will start the patient on detox Serax protocol." (Tr. 863) A medical exam revealed "no arthralgia, no back pain, no joint swelling, no limb pain . . . no stiffness." (Tr. 869) That month, when Plaintiff followed up with Dr. Tucker, he reported that "[m]ost of his pain recently has not been in his back. He has been having abdominal pain." (Tr. 1064) Dr. Tucker noted Plaintiff's "lung sounds had wheezes bilaterally," and he reiterated his advice to quit smoking. (Tr. 1064) In July 2014, Plaintiff reported abdominal pain, shortness of breath, and back pain. (Tr. 1066)

Plaintiff returned to Dr. Tucker in August 2014 for refills of his pain medication. (Tr. 1086) Plaintiff informed Dr. Tucker that "it is working well. It is controlling his back pain and his abdominal pain in acceptable fashion." (Id.) Plaintiff's low back area was "tender over the lumbar musculature" and "lifting tests on both legs were negative." (Id.) Dr. Tucker refilled Plaintiff's Viibyrd and methadone. (Id.)

Plaintiff again sought treatment for abdominal pain in August, September, and October 2014. (Tr. 942, 965, 995) Reviews of Plaintiff's systems performed in September and October stated: "no arthralgia, no limb pain, no neck pain." (Tr. 942, 973) In October, the examining physician noted that Plaintiff was "out of his methadone" and diagnosed him with "alcohol withdrawal syndrome." (Tr. 943) A CT of his abdomen and pelvis revealed cystic changes in the lungs. (Tr. 948) When Plaintiff followed up with Dr. Tucker, he reported that he had abstained from alcohol for two months but "has been having a lot more back pain since he quit using alcohol." (Tr. 1103) Dr. Tucker increased Plaintiff's methadone dosage. (Id.) In November 2014, Plaintiff informed Dr. Tucker that "his low back area has been bothering him, but just like usual, and his medicines are working well." (Tr. 1110) A couple days later, Plaintiff presented to Dr. Humam with "worsening cough and shortness of breath and decrease air entry with harsh breathing sounds." (Tr. 1116)

In December 2014, Plaintiff followed up with Dr. Trucker for treatment of chronic pain in his lower back and epigastric abdomen. (Tr. 1120) At that time, Plaintiff had abstained from alcohol for ninety-one days and reported that he "really feels better than he has in years" and "the methadone is working well. He is having no issues with that medication." (Tr. 1120)

In January 2015, Plaintiff returned to Dr. Tucker's office for his naloxone therapy and methadone refill. (Tr. 1134) Plaintiff informed Dr. Tucker that "the cold weather has caused

him quite a bit more discomfort and he needs to increase his methadone if at all possible." (Id.) Dr. Tucker noted Plaintiff's continued abstention from alcohol and "low back tenderness over the lumbar spine musculature….and leg lifting tests on both legs were negative." (Id.) Dr. Tucker increased Plaintiff's methadone dosage. (Id.)

Later that month, Dr. Tucker completed another MSS for Plaintiff, stating that Plaintiff could: occasionally lift/carry ten pounds; frequently carry less than ten pounds; stand/walk or sit less than two hours in an eight-hour workday; sit fifteen minutes at a time; stand five to ten minutes at a time: occasionally twist and climb stairs and ladders; and never stoop or crouch. (Tr. 1123-26, 1136) In support of these limitations, Dr. Tucker pointed to: "straight leg lifting test positive (R) not (L)"; restricted range of motion in right shoulder and right knee; and "convulsions with loss of consciousness," which "only friend observed." (Tr. 1125) During the examination, Plaintiff informed Dr. Tucker that "it is very hard to concentrate." (Tr. 1138, 1140) Dr. Tucker opined that Plaintiff would be off task about 25% of the time in a typical workday and required unscheduled breaks "probably every 20 minutes, and they would last for potentially 15 minutes per his statement." (Tr. 1140-41)

### III.    Standard for Determining Disability under the Act

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the ALJ engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities; or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) has impairments that prevent him or her from doing any other work. Id.

## IV.    ALJ's decision

In a decision dated February 20, 2015, the ALJ found that Plaintiff "ha[d] not been under a disability, as defined in the Social Security Act, from October 31, 2012 though the date of this decision. (Tr. 33)  The ALJ determined Plaintiff: (1) had not engaged in substantial gainful activity since October 31, 2018; (2) had the severe impairment of COPD; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 26)  After reviewing Plaintiff's testimony and medical records, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (Tr. 29)

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work except he "should have no exposure to temperature extremes, humidity, strong odors, fumes, dust, chemicals, or other respiratory irritants" and "should not work around hazards such

as unprotected heights or dangerous machinery and [was] limited to simple, routine tasks." (Tr. 26-27) Finally, the ALJ concluded that Plaintiff could not perform his past relevant work, but he could "perform other jobs that existed in significant numbers in the national economy and was, therefore, not disabled." (Tr. 32-33)

## V.    Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F. 3d 249, 250 (8th Cir. 1993)). To determine whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the finding and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

## VI.     Discussion

Plaintiff claims that substantial evidence does not support the ALJ's finding that he was not disabled because the ALJ erred in: (1) discrediting the opinion of Plaintiff's treating physician, Dr. Tucker; and (2) formulating Plaintiff's RFC. (ECF No. 19)  In response, Defendant argues that the ALJ properly considered the evidence, including Dr. Tucker's opinion and Plaintiff's allegations of disabling limitations, in reaching his decision. (ECF No. 24)

### A.  Treating physician

Plaintiff claims the ALJ erred "in failing to give more weight" to the opinions of his primary care physician, Dr. Tucker. (ECF No. 19 at 7)  More specifically, Plaintiff asserts that his medical records supported the limitations that Dr. Tucker imposed due to Plaintiff's knee pain, back pain, and COPD, and "there is no contradictory evidence in the record." (Id. at 12) Defendant counters that the ALJ "gave several good reasons supported by substantial evidence for his decision to discredit Dr. Tucker's opinions[.]" (ECF No. 24 at 11)

A treating physician's opinion regarding a claimant's impairments is entitled to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight. Id.   This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. See 20 C.F.R. §§ 404.1527, 416.927; Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir.1991).  "Although a treating physician's opinion is entitled to great weight, it does not automatically control or

obviate the need to evaluate the record as [a] whole." Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quotation omitted).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

In this case the ALJ thoroughly reviewed Plaintiff's testimony, adult function report, and medical records, as well as the two MSSs completed by Dr. Tucker, and explained his reasons for discrediting Dr. Tucker's opinion. The ALJ wrote:

> The undersigned cannot accept Dr. Tucker's opinions regarding the frequency of moving about and shifting because those circled limitations are not supported by the objective diagnostic testing, medical treatment sought, medical treatment offered, clinical signs and medications prescribed. These opinions are given no weight because Dr. Tucker is a primary care physician and not an orthopedic surgeon or neurosurgeon. More specifically, the limits on sitting, standing and walking are not consistent with the fact that no treatment from [an] orthopedic surgeon or neurosurgeon has taken place; no clinical sign of consistent spasm, atrophy or radiculopathy are noted. The opinion that he will need to lie down at unpredictable intervals during the work shift every 15 minutes (or 4 or 5 times for 20 minutes) is not consistent with his admitted activities of daily living or that he has not sought treatment from an orthopedic surgeon or neurosurgeon. Further, Dr. Tucker's letter of September 27, 2013 . . . indicates that the limitations are based on the claimant's recitation of his subjective limitations, rather than medical evidence of record.

(Tr. 31) However, the ALJ assigned "some weight" to Dr. Tucker's opinion regarding Plaintiff's environmental limitations "because they are consistent with the medical evidence of record." (Id.)

Plaintiff argues that the ALJ erred in discounting Dr. Tucker's medical opinion because the factors set forth in the regulations weighed in his favor. However, the question before the Court is not whether the ALJ assigned Dr. Tucker's the proper amount of weight. "Once the ALJ has decided how much weight to give a medical opinion, the Court's role is limited to reviewing whether substantial evidence supports this determination, not deciding whether the evidence supports the plaintiff's view of the evidence." Poppe v. Berryhill, No. 2:16-CV-90-JMB, 2018 WL 1317171, at *11 (E.D. Mo. March 14, 2018) (quotation omitted).

Based on the Court's review of the record, substantial evidence supported the ALJ's evaluation of Dr. Tucker's medical opinions. First, the ALJ found that the objective findings were inconsistent with the extreme functional limitations identified in the MSSs. The ALJ provided a detailed summary of results from Plaintiff's repeat chest x-rays, CT scans, and pulmonary functions tests. An x-ray of Plaintiff's lumbar spine taken in October 2011, prior to the alleged onset date, was essentially unremarkable. The record contained no MRIs or more recent diagnostic evidence relating to problems with Plaintiff's shoulder, knee, or back pain.[4]

The ALJ further found that Dr. Tucker's clinical observations did not support the functional limitations he identified. Plaintiff's straight leg tests were consistently negative and his musculoskeletal system examinations were frequently normal. The ALJ noted that Plaintiff

---

[4] Plaintiff points to evidence in the record that Dr. Tucker ordered him an MRI in October 2011 but his insurance company refused to cover it. In fact, Plaintiff's medical records reflect that insurance company declined to cover it at that time because it wished to see "a longer period of conservative treatment documented before the MRI would be allowed." Plaintiff does not allege any subsequent efforts to obtain an MRI.

generally reported no chest pain or discomfort and he had a normal heart rate and no palpitations. Plaintiff oxygen saturation level was usually 96% or above, and he responded well to bronchodilators. In June 2014, Dr. Humam noted no active COPD symptoms, and the following month he observed only mild shortness of breath. In September 2014, he had normal airway and breath sounds. In December 2014, Plaintiff informed Dr. Tucker that he felt better than he had in years. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (quoting Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004)).

The ALJ also discredited Dr. Tucker's opinion because "the limitations are based on the claimant's recitation of his subjective limitations, rather than medical evidence of record." (Tr. 31) Dr. Tucker's treatment notes corresponding with the dates he completed the MSSs in 2013 and 2015 reveal that he completed the checklist form on the basis of Plaintiff's self-reported limitations. "An ALJ may award less weight to a medical opinion when that opinion appears to be largely based on the plaintiff's subjective complaints." Sears v. Berryhill, No. 6:16-CV-3483-CV-RK, 2017 WL 63443804, at *1 (W.D. Mo. Dec. 12, 2017) (citing Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006)).

Finally, the ALJ observed that the generally conservative treatment that Dr. Tucker and Plaintiff's other physicians provided undermine the extreme limitations in Dr. Tucker's MSSs. (Tr. 30). As the ALJ noted in his decision, Dr. Humam treated Plaintiff's COPD with Spiriva, Combivent, Singulair, Dulera, and periodic courses of prednisone. Plaintiff was not prescribed oxygen or hospitalized due to breathing difficulties. Dr. Tucker treated Plaintiff's back pain with pain medication and occasional osteopathic manipulation. As the ALJ emphasized in his decision, Plaintiff did not seek treatment from an orthopedic surgeon or a neurologist. Nor does

it appear that Dr. Tucker recommended Plaintiff do so.  The need for only conservative treatment contradicts allegations of disabling pain.  <u>Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993).

Plaintiff suggests that, because the record contained no medical opinion evidence contradicting Dr. Tucker's opinion, the ALJ "simply ma[d]e his own conclusions."  (ECF No. 19 at 7)  The Eighth Circuit has held, however, that an ALJ is not required to rely on one doctor's opinion entirely or choose between medical opinions.  <u>Hensley v. Colvin</u>, 829 F.3d 926, 932 (8th Cir. 2016); <u>Martise v. Astrue</u>, 641 F.3d 909, 927 (8th Cir. 2011).  Rather, the ALJ must evaluate the record as a whole.  <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1013 (8th Cir. 2000).   The ALJ evaluated the record as a whole, and the Court finds that substantial evidence in the record supported the ALJ's weighing of Dr. Tucker's opinion.

### B.  RFC

Plaintiff challenges the ALJ's RFC determination, arguing that the ALJ "failed to include detailed findings, consider medication side effects and address Plaintiff's ability to perform full-time work on a regular and continuing basis."[5]  (ECF No. 19 at 13).  Defendant counters that the ALJ properly considered the entire record and explained the RFC finding.   (ECF No. 24)

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations.  20 C.F.R. § 404.1545(a)(1).  <u>See also</u> <u>Masterson v. Barnhart</u>, 363 F.3d 731, 737 (8th Cir. 2004).   "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  <u>Moore v. Astrue</u>, 572 F.3d 520, 523 (8th Cir. 2009) (quotation omitted).  The claimant bears the burden of proving disability and demonstrating his or her RFC.  <u>Martise v. Astrue</u>, 641 F.3d 909, 923 (8th Cir. 2011).

---

[5] Because Plaintiff does not discuss any alleged side effects of his medication in his brief, the Court need not consider this argument.

In this case, the ALJ thoroughly reviewed Plaintiff's medical records, opinion evidence, and testimony in formulating his RFC. The ALJ found that Plaintiff had the RFC to perform light work "except he should have no exposure to temperature extremes, humidity, strong odors, fumes, dust, chemicals or other respiratory irritants. He should not work around hazards such as unprotected heights or dangerous machinery and he is limited to simple, routine tasks." (Tr. 27).

Plaintiff asserts that the ALJ did not satisfy the "Narrative Discussion Requirements" of SSR 96-8p. SSR 96–8p, states: "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p at 7. "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work related activity the individual can perform based on the evidence available in the case record  Id.  "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." Id.  See also Kimmel v. Berryhill, No. 2:15-CV-83-NAB, 2017 WL 1105122, at *5 (E.D. Mo. March 24, 2017).

In this case, the ALJ provided a thorough RFC discussion, which took into account Plaintiff's physical impairments and credible, subjective complaints. The ALJ made a detailed credibility finding, examined Plaintiff's daily activities, discussed the medical evidence, considered Plaintiff's noncompliance with medical advice, and determined how Plaintiff's COPD limited his ability to work. To the extent Plaintiff challenges the ALJ's failure to include

a limitation on the use of his right arm, the record did not support a finding that Plaintiff could not use his right arm to the extent that it limited his ability to perform sedentary work.  Based on the foregoing, the Court finds that the ALJ's opinion provides a sufficient narrative of the medical evidence relied upon to support the limitations in the RFC.

## I.      Conclusion

For the reasons discussed above, the undersigned finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED.**

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE


Dated this 18th day of September, 2018